** NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 8-6-2009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   07-CR-168-01-PB
            v.                  *   September 25, 2007
                                *   9:45 a.m.
      JASON GERHARD             *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE JAMES R. MUIRHEAD

APPEARANCES:

| | |
|---|---|
| For the Government: | Robert M. Kinsella, AUSA<br>U.S. Attorney's Office |
| For the Defendant: | Stanley W. Norkunas, Esq.<br>Norkunas Law Office |
| Probation Officer: | Jodi Lines |
| Court Reporter: | Susan M. Bateman, CSR, RPR, CRR<br>Official Court Reporter<br>United States District Court<br>55 Pleasant Street<br>Concord, NH 03301<br>(603)225-1453 |

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  We have for consideration this
 3   morning a detention hearing in the matter of the
 4   United States versus Jason Gerhard, criminal case
 5   07-168-01-PB.
 6            THE COURT:  You may proceed.
 7            MR. KINSELLA:  Good morning, Judge.  The
 8   government is seeking detention in this case because
 9   the defendant clearly and unequivocally poses a
10   significant danger to the community.  He also poses a
11   significant flight risk if he's released pending his
12   trial, and I want to explain to you some of the
13   reasons why I'm making these arguments to you.
14            First, as you know, for the past several
15   months Edward and Elaine Brown have made numerous
16   public statements from their fortress-like home in
17   Plainfield, New Hampshire indicating their attempt to
18   forcibly resist any effort by federal law enforcement
19   officers to arrest them.  They have even announced
20   their intention to kill law enforcement officers who
21   might try to arrest them.  These public statements and
22   their statements regarding their opinion regarding the
23   tax laws of the United States have attracted a number
24   of different people to their home who have
25   demonstrated their support to the Browns in a variety
```

1  of different ways.

2         The defendant in this case is one of four

3  individuals who have been charged with arming the

4  Browns in an effort to help them carry out their

5  threats to forcibly resist their arrest and

6  potentially to kill law enforcement officers who might

7  participate in that effort.

8         Since the Browns -- warrants were issued for

9  the Browns' arrest.  The defendant made a number of

10 different -- or a number of trips from his home in

11 Long Island, New York to the Browns' home where he was

12 welcomed as a guest and remained overnight for several

13 days at a time.

14        During those visits the defendant

15 demonstrated in unmistakable ways his intent to help

16 the Browns forcibly resist their arrest and to help

17 them, if necessary, to kill people who might try to

18 arrest them.

19        In this regard, I have a number of exhibits I

20 would like to show to you which demonstrate

21 unequivocally the defendant's intent to help the

22 Browns in that way.

23        First, I'm displaying for you an exhibit that

24 I believe will -- as Government's Exhibit No. 1.

25 Judge, that is an aerial photograph of the Browns'

 1   residence in Plainfield, New Hampshire.  As you can
 2   see where my pen is -- I hope you can see
 3   that -- where my pen is pointing, this is a driveway
 4   that leads to the front -- actually, it's the road
 5   that the property is located on into the Browns'
 6   property.  As you travel clockwise around the circular
 7   part of this driveway, there is what appears to be a
 8   secondary residence at the far left hand corner of
 9   this photograph.
10           As you travel around the property, there's a
11   garage storage area, the Browns' residence and an
12   observation tower, which I'm told is very much like
13   those that you would see at a penitentiary or a prison
14   that gives a person who is standing at the top of that
15   tower the ability to see in 360 degree views around
16   the property.
17           Under the circumstances, a person who would
18   be there with a rifle or another firearm would pose an
19   immediate and significant and substantial threat to
20   any unwanted visitors, including law enforcement
21   agents.
22           This is a piece of property and a residence
23   that took a lot of time to design and to build.  It
24   was designed by the Browns specifically with an eye
25   towards the events that we're experiencing today.  It

 1  is this residence that the defendant chose to drive to
 2  from Long Island, New York on a number of different
 3  occasions to meet with and to assist people who
 4  publicly announced their willingness to kill federal
 5  law enforcement officers.
 6          Make no mistake about it.  The defendant was
 7  not just a mere visitor.  During one of his visits to
 8  New Hampshire in January of 2007, shortly after
 9  warrants were issued for the Browns' arrest, the
10  defendant went to a firearms dealer in New Hampshire
11  near the Browns' residence.
12          I'm displaying Exhibit No. 2 for you now,
13  Judge, and you can see at the top of that document the
14  defendant's name appears, his address and his date of
15  birth.  On the second page of that document the
16  defendant identified himself to the person whom he
17  bought that gun from using his New York driver's
18  license.  The type of firearm the defendant purchased
19  on that day at the firearms dealer near the Browns'
20  residence, according to this document, is a Bushmaster
21  Carbon 15 rifle.
22          What I'm showing to you now is Government's
23  Exhibit 2-a, which is a photograph of the type of
24  weapon that the defendant purchased on that day.  I'm
25  told that this type of weapon is, as you can see from

 1   its appearance, primarily designed as a military
 2   weapon.  I'm sure that there are some people who might
 3   use it as a hunting weapon, but it's primarily
 4   designed and intended to kill people.
 5           During another trip to the Browns' residence,
 6   where he was a guest for several days, the defendant
 7   also went to a nearby firearms dealer and purchased
 8   another weapon, as evidenced by Government's Exhibit
 9   No. 3.  This type of weapon is a Russian M-44 rifle,
10   according to that ATF 4473 form that was completed
11   when the defendant went to that firearms dealer that
12   day.  Government's Exhibit 3-a is a photograph of that
13   rifle -- or a rifle that is a Russian M-44.  Not the
14   particular rifle that Mr. Gerhard purchased that day.
15           As you may know, Judge, from other cases that
16   you've presided over in connection with this matter,
17   other individuals have been arrested, including a
18   person by the name of Daniel Riley.  Mr. Riley was at
19   the Browns' residence at times that the defendant was
20   there and on -- and also another person named Cirino
21   Gonzalez was at the Browns' residence at the same time
22   as the defendant was there on occasion.
23           On May 23, 2007, Mr. Riley went to the
24   firearms dealer in Alstead, New Hampshire, and he
25   completed ATF form 4473, which is Government's Exhibit

1  No. 4.  As a result of completing that form, Mr. Riley
2  purchased a Serbu .50 caliber assault rifle, which is
3  evidenced by Government's Exhibit No. 4.
4           On the same day his co-conspirator and a
5  conspirator with the defendant in this case, Cirino
6  Gonzalez, went to the same firearms dealer and
7  completed a 4473 form, which is Government's Exhibit
8  No. 5.  As you can see from the second page of that
9  document, Mr. Gonzalez also purchased a Serbu .50
10 caliber assault rifle.  Government's Exhibit 4-a is a
11 photograph of a Serbu .50 caliber assault rifle.
12          Judge, these rifles -- these .50 caliber
13 rifles are designed and intended to pierce tanks,
14 airplanes and bulletproof vests.  These Serbu .50
15 caliber rifles will also become, as you will see,
16 directly relevant to the defendant's conduct in
17 connection with this case and his efforts to arm the
18 Browns for their planned confrontation with law
19 enforcement officers.
20          Government's Exhibit No. 6 is an invoice from
21 Forward Supply Company, Waldorf, Maryland, describing
22 a number of items that were purchased by the defendant
23 in this case, Jason Gerhard, which, Judge, as you will
24 see, were intended to be delivered to the Browns'
25 residence at 401 Center of Town Road, Plainfield, New

 1   Hampshire.  These firearm accessories include a rifle
 2   sling, a carbine flash hider, a combat bayonet and a
 3   rifle scope.
 4           In addition, Judge, on July 20, 2007, the
 5   defendant returned to the firearms dealer in Alstead,
 6   New Hampshire, and there it appeared that he purchased
 7   or attempted to purchase two separate firearms, a
 8   Ruger Mini 14 and a Ruger M-77.
 9           We're seeking to clarify at this point
10   whether those firearms were actually purchased, but we
11   have the ATF 4473 form for those firearms that was
12   completed by the defendant on that day, and
13   Government's 7-a and 7-b are photographs of those
14   weapons.
15           On July 25, 2007, the defendant returned to
16   the Browns' residence during that -- on or about that
17   day and stayed as an overnight guest at their home,
18   and on that day he went back to the firearms dealer,
19   completed the ATF 4473, which is Government's Exhibit
20   No. 8, identified himself using his New York driver's
21   license, as you can see on the second page, and on
22   that day he purchased a Serbu .50 caliber rifle.
23           A few days later the defendant returned to
24   the firearms dealer in New Hampshire and completed
25   another ATF 4473 form, as demonstrated by Government's

1  Exhibit No. 9.

2          On that day he identified himself using his
3  New York driver's license, and he purchased a Storm
4  Ruger 10/22 rifle.  All of these weapons which can be
5  used by the Browns and certainly would be of use to
6  anyone standing in that lookout tower in the Browns'
7  residence.

8          The defendant was arrested in Missouri after
9  he had enlisted in the Army on September 13, 2007.
10 Shortly after he was arrested there, his place of
11 residence was searched on Long Island, and detectives
12 from the Suffolk Police Department, who went into the
13 defendant's residence with the consent of his parents,
14 went into a downstairs bedroom where the defendant
15 resides, with the consent of his mother, and in a box
16 in his bedroom they discovered a pipe bomb loaded with
17 explosives but without a fuse.  Government's Exhibit
18 No. 10 is a photograph of that pipe bomb.

19         Also inside the defendant's residence that
20 was seen by law enforcement officers who went into his
21 bedroom at that time propped up next to his bed was a
22 rifle.

23         If there's any question as to why the
24 defendant traveled to the Browns' residence and
25 whether or not his purpose for being there was to aid

1  the Browns -- and there should be no question at this
2  point -- any mystery that anyone might have in that
3  regard was removed entirely when the defendant went to
4  the Lebanon Police Department a few weeks ago to
5  complain that the United States Marshal Service had
6  unlawfully seized a car that he had been driving a few
7  days before -- a car that belonged to the Browns.
8          During that meeting with a deputy united
9  states marshal, the defendant said that he believed in
10 the Browns' cause and that he would participate in
11 their efforts to forcibly resist anyone who might try
12 to arrest them.
13         After the defendant was arrested in Missouri
14 he refused to participate in pretrial interviews with
15 the probation officer.  When he came here a few days
16 ago, he refused to participate.  His allegiance with
17 the Browns, his refusal to participate in these
18 proceedings to date demonstrate his utter contempt for
19 the authority of this Court.  He must not be released
20 because he's a danger and he poses a risk of flight.
21         THE COURT:  Mr. Norkunas?
22         MR. NORKUNAS:  Thank you, Judge.  Judge, may
23 I just have one moment, please?
24         THE COURT:  Yes.  Of course.
25         (Attorney Norkunas confers with Mr. Gerhard)

1          MR. NORKUNAS:  Thank you, Judge.  Judge,
2     present in the courtroom today is Mr. Gerhard's
3     mother.  She has come up here from New York.  She is a
4     third grade teacher on Long Island.
5          I think it is important for the Court to know
6     that he is a lifetime resident really of Brookhaven,
7     Long Island, in New York.  He has a twin brother,
8     Judge -- a twin brother who is completing his second
9     tour in Iraq as a gunner in a Blackhawk helicopter.
10    He has another brother who is gainfully employed down
11    in North Carolina.
12         He is a high school graduate, Judge, at this
13    point in time.  He was attending a community college
14    on Long Island earlier this year, and I have shared
15    with Mr. Kinsella and Mr. Huftalen today copies of the
16    college newspaper for which Mr. Gerhard wrote and some
17    very lengthy and engaging articles within there, and
18    that's how he came across the Browns, Judge.
19         He went north -- had no prior contact with
20    them -- to write for his college newspaper.  In doing
21    that, he has very eloquently set forth what he, as a
22    young man finding his way in the world, a young man
23    trying to express himself, trying to find meaning to a
24    lot of issues -- what he thought was a legal and
25    constitutional issue within that.

1          There is a particular paragraph in there,
2    Judge, if I might, in which -- and I would submit to
3    you, Judge, he wrote, I think, four or five different
4    articles in ensuing copies of the newspaper, and there
5    is one in which he very eloquently sets forth his
6    position -- or what he believes the position of the
7    Browns was in this particular case, and if I might,
8    Judge -- and he did include photographs of Mr. Brown.
9    Taxation is slavery.  A photograph is in there.  There
10   is a photograph of the house, itself, that he took and
11   put in there.
12          My understanding, Judge, is his first two
13   days up there to do the interviews he slept in his
14   car, and that was in January, Judge, when he did that.
15   He wrote that, "Mr. Brown's plight is something
16   everyone should be paying close attention to,
17   considering the importance it carries.  Brown was
18   prevented from presenting his own defense in court
19   within a country where the courts are the last stand
20   for the people; people who may be accused of a crime
21   in which to display their innocence.  Are those who
22   are accused of a crime stripped of all of their rights
23   entering a court of law?"
24          Obviously a philosophical discourse by a
25   young man seeking to determine what he may view as

 1  what is free speech and what does a person have a
 2  right to express and when does he have a right to
 3  express that, particularly when he comes into a court,
 4  Judge.
 5          This is also a young man, as the Court is
 6  aware from the presentation of Mr. Kinsella and from
 7  the documents before you, that had enlisted in the
 8  United States Army; as was his twin brother, Judge,
 9  and, in fact, when arrested, he was arrested on a
10  military post in Missouri, itself, Judge.
11          What the government is trying to present
12  here, Judge, is -- first of all, that this
13  gentleman -- I would submit that he's not a flight
14  risk.  I don't think the reality of any presentation
15  here would be that he is a flight risk.
16          He has wanted to express his views.  He has
17  shown that.  He has wanted to be heard.  There was his
18  home.  There was the military of which he was engaged.
19  He is not seeking to move anywhere, do anything.  He
20  wants to come forward.  He wants to give a
21  presentation on what he believes are issues important
22  to the people of the United States.  I would submit,
23  Judge, it's not that.
24          What the government is asserting in this case
25  why the Court should hold him is that he is a danger

1  to others, and apparently, Judge, that danger was that
2  he may have supplied firearms to the Browns.
3        I would submit the last presentation of Mr.
4  Kinsella -- some statement that was attributed to him
5  out of the Lebanon Police Department, Judge -- can be
6  looked at in several different ways -- was that if you
7  try to forcibly take me, I will resist you.  We have
8  seen that through civil rights marches.  We have seen
9  that through other protests, Judge.  I can resist
10 forcibly, but I don't do anything.  I force you to do
11 something.  I lay down.  You have to handcuff me.  You
12 have to drag me out, and I'm charged with forcibly
13 resisting arrest.
14       So the context of that statement, Judge, I
15 would submit, as it presently stands, is not something
16 where it can be viewed as, oh, that's it, he said he
17 was going to attempt to or do something to kill, and
18 again, by the best view of what is presented here, I
19 know the context of this hearing, Judge, is that he
20 presented weapons or delivered weapons perhaps, and we
21 haven't heard anything that they, in fact, were
22 delivered to the Browns or we have shown that they
23 were delivered or how they would have arrived there or
24 what is attributed to Mr. Gerhard.  I don't know
25 anything about the other two gentlemen, Judge, and

 1   that, therefore, when he was in the military, it's
 2   possible that the Browns could have taken some sort of
 3   forceable action because from 1,500 miles away he was
 4   certainly not going to be of any assistance to the
 5   Browns, themselves, when he was arrested.
 6           Judge, in relation to the weapons,
 7   themselves, certainly there is a concern relative to
 8   the .50 caliber.  I would submit the Bushmaster,
 9   itself, is sold universally.  Certainly it can be
10   based upon or is based upon the M-16 and/or other
11   weapons, but of and by itself as a .223 caliber,
12   Judge, there are various purposes for which that can
13   be purchased, used by gun enthusiasts, shooters,
14   whatever that may be, but a .50 caliber is certainly
15   an issue which I understand the Court would have
16   concern about.  A person would not be taking that to
17   do target practice in their backyard.  I concede that,
18   Judge.
19           The Russian weapon, itself, Judge -- my
20   understanding is it may not have been functioning
21   because it was an older weapon, itself, Judge, when it
22   was purchased.
23           There is no indication from the presentation
24   given by the government that there was, in fact, the
25   existence of a conspiracy between Mr. Riley, Mr.

1  Gonzalez and Mr. Gerhard, Judge, as it would relate to
2  dangerousness, itself, in this particular case.
3          Mr. Gerhard, again, did travel on numerous
4  occasions to the Brown residence.  Apparently there
5  was no prohibition from people going in.  It was not a
6  crime to go in to talk to them, to solicit for them,
7  and again, he wrote a series of articles over several
8  months for his college newspaper on exactly what he
9  was doing there, why he was there, and espoused the
10 view that he had.  He did believe in their cause, as I
11 expressed it to the Court that was set forth, Judge,
12 in that.
13         The bomb, as it's referred to, that was found
14 in his home, Judge, my understanding is that there was
15 gunpowder in a tube.  There was no fuse.  My
16 understanding is, also, that he had made a statement
17 at some point in time that he had hoped to be a combat
18 engineer in the military, and as youth may do, he had
19 constructed something he then believed he should
20 unconstruct at some later date.
21         It's difficult to believe that something like
22 that which you've left in your home with your parents
23 in a bedroom can be part of some alleged conspiracy up
24 in New Hampshire at that point in time, Judge, and I
25 would submit that that should not add anything to the

1  Court's determination of whether there is a
2  dangerousness issue with this gentleman.
3         Judge, the aspect of whether he chooses to
4  participate or not I think is a real problem for the
5  government to raise that because this young man is
6  entwined with what are his constitutional rights.
7  When may he, as an individual, stand up to the
8  government?  When may he, as an individual,
9  participate in what he may do or not do?  It's his
10 absolute right not to do that.  It would be as if,
11 Judge, he invoked his Miranda rights and he wouldn't
12 speak to us, and therefore, he's dangerous.  He
13 wouldn't do it.  He wouldn't confess.  He has an
14 absolute right not to participate if he chooses to do
15 so, and I would submit, Judge, that's not an
16 indication that he is a dangerous individual.
17        They knew where he lived.  They knew where he
18 went to school.  They knew everything -- the
19 government, the agencies that were involved with this
20 particular case.  He choose to stand up and say, I'm
21 not going to participate and that is my right to do
22 so, and he exercised that right, Judge, and I think
23 that undermines the government's issue of
24 overreaching, trying to show dangerousness on behalf
25 of this young man, Judge.

1          There is a series of conditions, Judge, the
2  Court could impose upon him.  The Court could seek to
3  place a bracelet on him.  He does have a home.  He has
4  a very structured family.  He has his mother, his
5  stepfather, in a home on Long Island, Judge.  The home
6  is somewhat by itself.  Certainly he could be
7  restrained and could stay there under terms and
8  conditions.  He could be prohibited, obviously, from
9  leaving the home without express conditions.
10         I would submit, Judge, that this is a
11 gentleman in which there are terms and conditions --
12 there is a rebuttable presumption, and I would submit
13 that he has met that, and the Court could impose a
14 series of conditions for him to go home and allow him
15 to remain there during the pendency of this case, and
16 I would ask this Court to do so, Judge.  Thank you.
17         THE COURT:  Well, it does appear a shame that
18 this young man has been misguided by the Browns, whose
19 cause is not a legitimate cause.  The Chief Judge of
20 this Court during that trial determined that the
21 evidence, so-called, that the Browns wanted to submit
22 was not relevant and determined that free speech
23 doesn't include the right to seek jury nullification
24 upon totally baseless views on taxation.  That's what
25 he supposedly is speaking of.

```
 1          This is a particular heinous thing to bring a
 2   .50 caliber rifle into the Browns' residence and leave
 3   it there.  Outrageous.  Anybody who knows anything
 4   about this rifle knows he can blow a human being to
 5   pieces and you won't be able to identify the parts --
 6   not a single part of the human body.
 7          This man is a danger to the community beyond
 8   any doubt.  The evidence that has been provided by
 9   proffer here is that this gentleman has brought to
10   convicted felons weapons, any one of which could kill
11   any officer of the law or citizens who live in that
12   area.
13          He obviously is enamored with things like
14   pipe bombs and everything else.  No matter how close
15   his family may be, it's obvious that they have not
16   been able to prevent him from getting access to major
17   weapons and providing them to convicted felons.  He is
18   a danger to the community.  He is a risk of flight and
19   will be detained until trial.
20          (Conclusion of Hearing at 10:15 a.m.)
21
22
23
24
25
```


```
                                                                    20

 1                    C E R T I F I C A T E

 2

 3

 4

 5         I, Susan M. Bateman, do hereby certify that the

 6   foregoing transcript is a true and accurate

 7   transcription of the within proceedings, to the best of

 8   my knowledge, skill, ability and belief.

 9

10

11

12   Submitted: 5-8-09     /s/   Susan M. Bateman
                           SUSAN M. BATEMAN, CSR, RPR, CRR
13

14

15

16

17

18

19

20

21

22

23

24

25
```